**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

PHILIP SERVICES CORPORATION,
*et al.*                                    §
                                            §
                                            §
VS.                                         §        CIVIL ACTION NO. H-06-2518
                                            §
                                            §
CITY OF SEATTLE                             §

**MEMORANDUM AND OPINION**

The debtor in a Chapter 11 bankruptcy proceeding, Philip Services Corporation, has

a hazardous-waste management business in the City of Seattle.   In the bankruptcy

proceeding, the City made claims for unpaid transfer and collection taxes from 1998 through

2002.   Philip Services objected.   The Bankruptcy Court held an evidentiary hearing and

overruled the objection.   Philip Services appeals, arguing that its waste-management

operations did not qualify as taxable activities or incidents under the language of the City's

tax ordinance; that the amounts assessed were incorrect because they did not properly apply

exceptions and exclusions set out in the ordinance; and that aspects of the taxes violate the

Commerce Clause and the Due Process Clause of the United States Constitution.   Based on

a careful review of the record, the  parties' submissions, and the applicable law, this affirms

the order of the Bankruptcy Court overruling the objections to the claims for unpaid taxes

with one exception.   This court reverses the Bankruptcy Court's ruling denying the objection

to the way in which the collection tax was calculated.   This case is remanded to the

Bankruptcy Court for proceedings consistent with this memorandum and opinion.   The reasons are set out below.

## I.   Background

Philip Services filed voluntary petitions for relief under Chapter 11, 11 U.S.C. § § 101 *et seq.*, in June 2003.  The Bankruptcy Court confirmed an amended reorganization plan that became effective on December 31, 2003.  The City of Seattle filed four claims for excise taxes and for interest on these taxes.  Claim No. 2287 was filed on September 8, 2003, covering the period 1998 through June 2, 2003.  The revised amount of that claim was $694,658.47.  Claims No. 5461, 1205, and 6074, filed postpetition as administrative expense claims for the period June 3, 2003 through December 1, 2003, totaled $58,150.45 as revised.

The excise taxes are a transfer tax imposed under Seattle Municipal Code 5.48.055(A) and a collection tax imposed under SMC 5.48.055(B).  The issues in this case are whether and how these code sections apply to Philip Services.

Chapter 5.48 of the Seattle Municipal Code is entitled:  "Business Tax – Utilities." Section 5.48.055 in effect during the relevant period stated:

> SMC 5.48.055 Solid waste activities subject to tax – AMOUNT. There is levied upon, and shall be collected from everyone including The City of Seattle, on account of the following business activities engaged in or carried on with respect to solid waste, an annual license fee or occupation tax in the amount to be determined by the application of the rates given below:
> A. Upon everyone engaged in or carrying on the business of operating a garbage transfer station or upon the business of transferring solid waste generated in or outside of Seattle from one (1) mode of transportation to another a fee or tax equal to Six Dollars and Twenty-five Cents ($6.25) per ton of the waste

handled for transportation or transported for garbage disposal, landfill, or incineration purposes. Effective January 1, 2003, upon everyone engaged in or carrying on the business of operating a garbage transfer station or upon the business of transferring solid waste generated in or outside of Seattle from one (1) mode of transportation to another a fee or tax equal to Six Dollars and Forty-five Cents ($6.45) per ton of the waste handled for transportation or transported for garbage disposal, landfill, or incineration purposes. To prevent pyramiding of the tax under this subsection when two (2) or more transfers occur in Seattle, the fee or tax is imposed only upon the last transferor and shall not apply to earlier transfers. Waste is transferred from one (1) mode of transportation to another whenever it is moved from a motor vehicle (including, for example, landgrading or earthmoving equipment), barge, train or other carrier to another motor vehicle (including landgrading or earthmoving equipment), barge, train or other carrier, irrespective of whether or not temporary storage occurs in the process, provided that waste shall not be considered transferred if it has been placed in a sealed shipping container prior to being moved from one mode of transportation to another in the City. Solid waste transported for recycling or reuse as recovered material (which solid waste shall contain no more than ten (10) percent non-recyclable material, by volume), yardwaste destined for composting, items to be scrapped for salvage, and sand and gravel for construction of a public improvement shall not be included in the tonnage by which the fee or tax is measured.

B. Upon everyone, including The City of Seattle, engaged in or carrying on the business of the collection of garbage, rubbish, trash, CDL Waste, and other solid waste, a fee or tax measured by the total of components 1 and 2 below:
1. Eleven and one-half (11.5) percent of the total gross income from the collection of solid waste in Seattle, less income derived from the activities identified in subsection C of this section; and
2. a. Twelve Dollars and Five Cents ($12.05) per ton of solid waste collected in Seattle, excluding the tonnage from recycling when such recycling contains no more than ten (10) percent non-recyclable material by volume, yardwaste destined for composting, items to be reused or scrapped for salvage, and/or sand and gravel for construction of a public improvement; or

> b. Effective January 1, 2003, Twelve Dollars and Forty Cents ($12.40) per ton of solid waste collected in Seattle, excluding the tonnage from recycling when such recycling
> contains no more than ten (10) percent non-recyclable material by volume, yardwaste destined for composting, items to be reused or scrapped for salvage, and/or sand and gravel for construction of a public improvement.

SMC § 5.48.055.

Section 5.48.055D of the Code provided as follows:

> The tax imposed under subsection A of this section applies to transferring in the City of all solid waste generated in or outside the City and the tax imposed under subsection B of this section applies only to collecting solid waste in the City. The taxes imposed under subsections A and B of this section are cumulative as to solid waste collected and transferred in the City, even though the same tonnage of solid waste may be involved at each successive stage in the disposal process and the economic burden of the two (2) taxes may aggregate.

*Id.* at § 5.48.055D.

The facts material to this appeal are largely undisputed, although the parties do dispute the legal characterization of those facts. The City of Seattle conducted an audit of Philip Services and issued tax assessments for unpaid collection and transfer taxes for 1998 to 2002. After Philip Services filed bankruptcy, the City filed claims for the unpaid taxes. Those claims were subsequently revised, taking into account exceptions and exclusions that Philip Services identified. Philip Services objected to the revised claims and the Bankruptcy Court conducted a trial on the objections. Two witnesses testified, Glen Dillman for Philip Services, and Joseph Cunha, the tax audit supervisor from the City of Seattle. The parties

submitted extensive documentary evidence and a detailed stipulation of a number of critical facts and propositions of law.  (Docket Entry No. 5).

The record disclosed the following facts.  Philip Services conducted its hazardous-waste management business under a Washington State Hazardous Waste Identification number.  Its business was picking up, treating, and properly disposing of hazardous wastes, alternative fuels, and waters.  (Docket Entry No. 3 at 4).  Philip Services competed with other companies in the hazardous-waste management business and did not operate under a franchise from the City.  Philip Services did not publish rates for services and did not run a regular pick-up schedule.  It charged varying rates, sometimes a flat fee and sometimes an itemized bill that included transportation costs.

Philip Services picked up hazardous waste from its customers in the City of Seattle, by appointment.  Once Philip Services picked up the waste, Philip Services was responsible for transporting, treating, and disposing of it in a manner that met regulatory requirements and documenting that compliance.  The waste was placed into sealed containers, such as drums, and transported to one of Philip Services's regional facilities, including one located in Seattle during 1998 through the fourth quarter of 2002, or to a third-party facility outside Seattle.  (Docket Entry No. 5-9 at Stipulations 17–20).

When containers of waste were brought to one of Philip Services's operational facilities, including the Seattle facility, most of the containers were opened and the contents sampled and mixed or combined with other waste, treated, and placed in another sealed container.  Some of the containers were opened, the contents sampled, and the container

resealed, without the contents being processed or treated.  All of the waste taxed was in sealed containers that Philip Services at some point opened before the waste was placed in another container or the original container was resealed.  (Docket Entry No. 5-9 at Stipulation 22).  The sealed containers of sampled or treated waste were then placed on a truck or other vehicle for transport to a disposal facility or recycling facility, some located outside the City.  All the waste that was taxed left the City of Seattle; some left the State of Washington.  (Docket Entry No. 5-9 at Stipulations 19–21; Docket Entry No. 5-23 at 71).

Of the waste brought to the Philip Services Seattle facility, approximately 25% was transported in sealed containers larger than 330 gallons, such as dumpsters, railway cars, tankers, and trailers.  (Docket Entry No. 5-9 at 5, Stipulation 19).  The remaining 75% was transported in smaller sealed shipping containers.  Of the smaller containers, approximately 75% was 55 gallon drums, 10% was 30 gallon drums, 5% was 85 gallon drums, and 5% was 20 gallon drums.  Containers that were 15 gallons or smaller made up the remainder.  (*Id.*)

Philip Services was also paid to handle contaminated water, which it treated and discharged.  Water treated at the Seattle facility went into alternative fuels, was incinerated, or went to Philip Services's facilities in Kent or Tacoma, Washington, for treatment and discharge into the sanitary sewer system of those cities.  Water that entered a municipal sewer system was ultimately discharged into navigable waters. (*Id.* at Stipulations 21, 34).

The Bankruptcy Court overruled the objections to the revised tax assessments, concluding that Philip Services was properly subjected to the collection and transfer taxes; the exclusion from the transfer tax for sealed containers was properly applied; the exemption

in the transfer and collection tax for recycled material did not apply to water treated and discharged or incinerated; the bulky-items exemption from the collection tax was properly applied; the collection tax was correctly measured; and the transfer tax did not discriminate against interstate commerce. (Docket Entry No. 5, Ex. 1).  Philip Services filed a motion for reconsideration.  One basis was an unpublished opinion, *Burlington Environmental, Inc. v. City of Bremerton*, No. 31923-3-II (Court of Appeals, Washington, Division II, Feb 15, 2006), which Philip Services presented as new authority for the claim that the collection tax was improperly calculated to include income from services beyond collecting solid waste within the City of Seattle.  (Docket Entry No. 5-15).  The Bankruptcy Court denied Philip Services's  motion for reconsideration. Philip Services timely appealed.

## II.    The Applicable Legal Standards

In reviewing a bankruptcy court decision, a district court functions as an appellate court and applies the standards of review generally applied in federal courts of appeal.  *In re Webb*, 954 F.2d 1102, 1103-04 (5th Cir.1992). A bankruptcy court's findings of fact are reviewed for clear error, with proper deference to that court's opportunity to make credibility determinations. FED. R. BANKR. P. 8013; *In re McDaniel,* 70 F.3d 841, 842-43 (5th Cir.1995). A finding of fact is clearly erroneous if, after review of all the evidence, the court is left with a firm and definite conviction that the bankruptcy court erred. *In re McDaniel*, 70 F.3d at 843. Legal conclusions are reviewed de novo. *Id.; In re Herby's Foods, Inc.*, 2 F.3d 128, 130 (5th Cir.1993).

"A proof of claim constitutes prima facie evidence of its validity and amount." *In re ProMedCo of Los Cruces*, 275 B.R. 499, 503 (N.D. Tex. 2002) (citing FED. R. BANKR. P. 3001(f); 9 *Collier on Bankruptcy* ¶ 3001.09[1] (15th ed. rev.2001)).   "Once that burden is met, whichever party would have the burden of proof respecting the claim outside the bankruptcy will bear that burden in bankruptcy. With respect to contest of a claim for [federal] income taxes, the burden of proof falls on the objecting party." *Id.* (citing *In re Domme*, 163 B.R. 363, 366 (D. Kan.1994); *In re Placid Oil Co.*, 988 F.2d 554, 557 (5th Cir.1993)).   This court must "give full faith and credit to the state law upon which the tax is based." *In Re Wolverine Radio Co.*, 930 F.2d 1132, 1148 (6th Cir. 1991) (citing *Arkansas Corp. Comm'n v. Thompson*, 313 U.S. 132 (1941)).

Recent cases applying Washington law clarify the burdens of proof in this case.  In *Simpson Inv. Co. v. State Dept. of Revenue*, 3 P.3d 741, 746 (Wash. 2000), a business owner challenged whether his business qualified as a "financial business" that was subject to certain taxes under the state tax code.   *Id.* at 744.   The Washington Supreme Court found that although under Washington law tax statutes are generally construed against the taxing authority, "when interpreting exemption or deduction provisions, 'the burden of showing qualification for the tax benefit . . . rests with the taxpayer . . . [and] in the case of doubt or ambiguity, [the provisions are] to be construed strictly, though fairly and in keeping with the ordinary meaning of their language, against the taxpayer." *Id.* at 149–150 (citing *Group Health Coop. of Puget Sound, Inc. v. Washington State Tax Comm'n*,433 P.2d 201 (Wash. 1967)).  The Washington Supreme Court stated that a court must evaluate the language of

8

a tax ordinance in the context of the entire statute so as to "avoid interpretations that are '[s]trained, unlikely, or unrealistic[.]'" *Id.* at 745–46; *see also In re Sehome Park Care Ctr., Inc.*, 903 P.2d 443 (Wash. 1995)).

## III.   Analysis

### A.   Do the Transfer and Collection Taxes Apply to Philip Services?

Philip Services argues that the transfer tax and the collection tax do not apply to it because these ordinances are "intended to tax utilities and only utilities." (Docket Entry No. 3 at 20).  It is undisputed that Philip Services is not a utility that is licensed, has a franchise, or is given exclusivity by the City.  The City responds that the ordinance language makes it clear that the taxes do not only apply to a "utility."

Philip Services cites Chapter 5.48's title, "Business Tax–Utilities," to support its contention that only a "utility" can be subject to the taxes at issue.  However, Section 5.48.055 states that it applies to "everyone . . . on account of the following business activities engaged in or carried on with respect to solid waste, an annual license fee or occupational tax. . . ."  Both Section 5.48.055(A) and (B) apply to "everyone engaged in or carrying on the business" relating to solid waste.  The collection tax and transfer tax sections make it clear that they are not limited to licensed or franchised utilities.  The Bankruptcy Court correctly rejected this argument.  (Docket Entry No. 5, Ex. 13 at 3).

### B.   Was Philip Services Engaged in "Transfers" under Section 5.48.055A?

9

Philip Services argues that its activities do not meet the code definition of "transfer" because the waste Philip Services handled was not "transferred from one (1) mode of transportation to another."  Section 5.48.055A provides:

> Waste is transferred from one (1) mode of transportation to another whenever it is moved from a motor vehicle (including, for example, landgrading or earthmoving equipment), barge, train or other carrier to another motor vehicle (including landgrading or earthmoving equipment), barge, train or other carrier, irrespective of whether or not temporary storage occurs in the process, provided that waste shall not be considered transferred if it has been placed in a sealed shipping container prior to being moved from one mode of transportation to another in the City

Seattle Municipal Code § 5.48.055A (1998).

### 1.    Was there a "Transfer?"

The record showed that Philip Services moved much of the waste from a "mode of transportation" to an operational facility, where containers were opened.  Some of the waste was treated and placed in another sealed container.  Some was treated and consolidated with other waste and then placed in another sealed container.  Some of the waste was left in the container and resealed or placed in another container that was sealed.  All of these sealed containers were then placed on another "mode of transportation."  (Docket Entry No. 5-9, Stipulations 18, 22).  Philip Services argues that the ordinance requires "direct movement from one carrier to another interruptible only by temporary storage," and that because the waste at issue was processed and treated between transfer from one carrier to another, the waste was not "transferred."  (Docket Entry No. 3 at 13; Docket Entry No. 7 at 2).

10

This argument contradicts the language of the ordinance, the stipulations, and the testimony at trial. "[T]ransferred from one (1) mode of transportation to another" is broadly defined as "whenever" waste is "moved from a motor vehicle . . . to another motor vehicle." The ordinance does not state that if any interim step occurs other than temporary storage, there is no "transfer." Instead, the ordinance states that a transfer occurs "irrespective of whether or not temporary storage occurs in the process." The undisputed evidence was that Philip Services used motor vehicles to transport waste in sealed containers to a facility where the containers were opened and the contents sampled and/or treated. The waste was then placed in containers which were sealed and then transferred to another motor vehicle for transportation to a "final disposal facility or a recycling facility." (Docket Entry No. 5, Ex. 8 at 7, Ex. 21 at 69–71). The Bankruptcy Court correctly interpreted and applied the ordinance in concluding that Philip Services was transferring waste from one mode of transportation to another and therefore subject to the transfer tax.

## 2. Was the Sealed-Container Exclusion Properly Applied?

Philip Services argues that it is not subject to the transfer tax because of the sealed-container exclusion. The ordinance states that "waste shall not be considered transferred if it has been placed in a sealed shipping container prior to being moved from one mode of transportation to another in the City." Philip Services argues that because the waste enters the facility in sealed containers, is treated or tested, and leaves the facility in sealed containers, there is no "transfer." (Docket Entry No. 3 at 13). The City of Seattle responds that the sealed-container exclusion applies only when the waste stays in the same sealed container at

11

all times.  (Docket Entry No. 6 at 9–12).  The City adjusted the transfer tax so that it the taxes were not applied to waste transported in a single sealed container that was not opened after it was first sealed. (Docket Entry No. 6 at 10, Docket Entry No. 5-9 at Stipulation 22).

The Bankruptcy Court concluded that because the ordinance referred to "'a' sealed container, one container," the sealed-container exclusion applied only to waste that was in a sealed shipping container before it was transferred and remained sealed in that container. (Docket Entry No. 5 at 4).  This court agrees.  Philip Service's interpretation that the exclusion applies if at any point the hazardous waste was in a sealed container—even if it was placed in a sealed container, which was transported on a motor vehicle, unsealed, the waste removed, and the waste then placed in a different container that was sealed and placed on a motor vehicle—would lead to the result that ultimately no transfers of hazardous waste would be taxable.

This court affirms the Bankruptcy Court's conclusion that the sealed-container exclusion from the transfer tax was properly limited to waste that was in a single sealed shipping container.

### C.    Does the Collection Tax Apply to Philip Services?

The collection tax is imposed "on the business of the collection of garbage, rubbish, trash, CDL Waste, and other solid waste."  SMC § 5.48.055B.  Philip Services argues that the word "and" requires that the taxpayer collect all five enumerated types of waste to qualify for the tax.  (Docket Entry No. 3 at 17–20).

Of the five enumerated types of waste, "garbage," "rubbish," "CDL," and "solid waste" are defined in the Seattle Municipal Code."[1]   "Trash" is not a defined term.   Philip Services contends that the ordinance can only apply to an entity that collects all the enumerated categories of waste because "and" is conjunctive.   The City responds that it is clear that the tax applies to the collection of any of the enumerated categories.   The Bankruptcy Court specifically addressed this issue, after allowing posttrial submissions, in the order denying the motion for reconsideration.   The court found that reading "and" to limit the ordinance to the collection of all the enumerated categories of waste was an absurd result.

The potentially confusing uses of "and" and "or" has long been noted in students of legal writing.   *See* Kenneth A. Adams and Alan S. Kaye, *Revisiting the Ambiguity of "And" and "Or" in Legal Drafting*, 80 ST. JOHN'S L. REV. 1167 (2007).   The argument raised by Philip Services is that "and" must be a conjunction and not disjunction.   But Philip Services ignores the fact that "and" can convey not only that members of a group are to be considered together or collectively, but also that they be considered separately or individually.   "[I]n most

---

[1] "Garbage" is "all discarded putrescible waste matter, including small dead animals weighing not over fifteen (15) pounds, but not including sewage or sewage sludge or human or animal excrement or yardwaste." Seattle Municipal Code § 21.36.014.  "Rubbish" is "all discarded nonputrescible waste matter excluding yardwaste."  *Id.* at § 21.36.016.  CDL waste is "Construction, Demolition and Landclearing Waste," defined at length in section 21.36.012.  "Solid waste" is defined to include "all putrescible and nonputrescible solid and semisolid wastes, including but not limited to garbage, rubbish, yardwaste, ashes, industrial wastes, infectious wastes, swill, demolition and construction wastes, abandoned vehicles or parts thereof, and recyclable materials. This includes all liquid, solid and semisolid materials which are not the primary products of public, private, industrial, commercial, mining and agricultural operations.  Solid waste includes, but is not limited to sludge from wastewater treatment plants, seepage from septic tanks, wood waste, dangerous waste, and problem wastes, as well as other materials and substances that may in the future be included in the definition of 'solid waste' in RCW 70.95.030. Solid waste does not include recyclable materials (including compostable waste) collected from commercial establishments." *Id.* at § 21.36.016(12).

cases . . 'and' is used in the several rather than the joint sense," to convey the sense of together or separately. *See id.* at 1172-73, *quoting* F. Reed Dickerson, *The Fundamentals of Legal Drafting* § 6.2, at 105 (2d ed. 1986).

The ordinance makes it clear that the enumerated categories of waste are a group that is to be considered separately and individually, not together or collectively. The inclusion of "other solid waste" in the listed categories means that if the categories were considered only collectively, the result would defy common sense. "Other solid waste" includes—but is not limited to—all the other enumerated categories of waste. To interpret "and" to require collective consideration would mean that the only business to which the collection tax applied could be businesses that collected every possible type of solid waste. To interpret "and" as is usually done, in the "several rather than the joint sense," means that the ordinance applies to a business that collects any of the categories of enumerated waste, which is consistent with the words used and common sense.

Philip Services also argues that it does not "collect" waste but instead merely "picks it up." (Docket Entry No. 3 at 19). Philip Services draws a distinction between "collect" as requiring a regularly scheduled route—like that used by a municipal garbage truck—and individually arranged pick-ups of waste from customers. As the Bankruptcy Court noted, the ordinance does not limit "collection" to a regular route and does not "distinguish between 'picks up' and 'collects' as used in this context." (Docket Entry No. 5, Ex. 13 at 4). This court agrees. The Bankruptcy Court correctly interpreted the collection tax ordinance.

14

**D.      Was the "Bulky Items" Exclusion from the Collection Tax Properly Applied?**

The collection tax ordinance excludes income from "[c]ollection and disposal of bulky items and white goods."  SMC § 5.48.055C(4).  Philip Services argues that "bulky items" is not defined by the ordinance and that common usage controls.  (Docket Entry No. 3 at 23).

"Bulky items and white goods" are defined in the Seattle Municipal Code chapter on solid waste.  Section 5.48.055B defines "bulky items" and "white goods" as follows:

> "White goods" are large household appliances, such as refrigerators, iceboxes, stoves, washing machines, dryers, dishwashing machines and air conditioners.
>
> "Bulky items" include and are illustrated by such articles for household use as furniture, mattresses, box springs, television sets, stereos, and wardrobes. Neither term includes motor vehicles or hulks; car parts and tires; commercial machinery or equipment; lumber and building materials; or hazardous wastes.

SMC § 21.36.087B (1998).  Philip Services asserts that these definitions do not apply because "the absence of a cross reference means using [the Seattle Municipal Code § 21.36] definition is incorrect."  Philip Services inconsistently argues that the § 21.36 definition of "solid waste" applies to the section 54.48.  (Docket Entry No. 3 at 20, 23).

The Seattle Municipal Code defines "bulky items" to exclude hazardous waste. Washington law does not require an explicit cross-reference for a closely related statutory definition to apply. *See, e.g., Gontmakher v. City of Bellevue*, 85 P.3d 926 (Wash. 2004).  The Bankruptcy Court correctly held that the "bulky items" exclusion did not apply.

**E.      Was the Collection Tax Properly Calculated?**

Philip Services argues that the City incorrectly calculated the collection tax by including in the taxed gross income revenues for activities that were not "collection" and revenues for activities that occurred outside the City of Seattle.  The City responds that all the income Philip Services received was for "collection" and that the subsequent activities of transferring, treating, and disposing of the waste were expenses that cannot be deducted.

The collection tax applies to "everyone, including The City of Seattle, engaged in or carrying on the business of the collection of garbage, rubbish, trash, CDL Waste, and other solid waste."  During the relevant period, the tax had two components:  (1) a specified percent "of the total gross income from the collection of solid waste in Seattle, less income derived from the activities identified in subsection C of this section";[2] and (2)  a specified dollar amount for each ton of "solid waste collected in Seattle, excluding the tonnage from recycling when such recycling contains no more than ten (10) percent non-recyclable material by

---

[2] The activities excluded from "gross income" under Subsection C are:

> 1.  Collection and/or sale of recycled materials and/or recovered materials, including charges for the lease or rental of containers used in the collection of recycled/recovered materials; 2. Collection and/or sale after processing of yardwaste products, including charges for the lease or rental of containers used in the collection of yardwaste products; 3. Sale of containers used for collection of residential solid waste; 4. Collection and disposal of bulky items and white goods; 5. Grants and contracts from governmental agencies; 6. The City of Seattle for collecting or disposing of residential garbage and other solid waste; 7. The portion of the City's solid waste collection receipts expended for collection of recyclable materials and yardwaste; and 8. Transportation or deposit of sand and gravel for construction or a public improvement."

SMC § 5.48.055(C).

volume, yardwaste destined for composting, items to be reused or scrapped for salvage, and/or sand and gravel for construction of a public improvement."   SMC § 5.48.055.   Section 5.48.055D of the code carefully limits subsection B, the collection tax, "only to collecting solid waste in the City."   Subsection D explains the relationship of the collection and transfer taxes imposed under subsections A and B:   "The taxes imposed under subsections A and B of this section are cumulative as to solid waste collected and transferred in the City, even though the same tonnage of solid waste may be involved at each successive stage in the disposal process and the economic burden of the two (2) taxes may aggregate."   *Id.* at § 5.48.055D.      The ordinance is drafted to comply with constitutional limits on income taxes.  The United States Constitution bars taxation of extraterritorial income.  *See Container Corp. v. Franchise Tax Board* 463 U.S. 159, 164 (1983); *ASARCO Inc. v. Idaho State Tax Com.*, 458 U.S. 307, 315 (1982).  However, it permits taxation of "an apportionable share of the multistate business carried on in part in the taxing State," *Allied-Signal, Inc. v. Director, Division of Taxation,* 504 U.S. 768, 778 (1992), and grants taxing jurisdictions some leeway in separating out their respective shares of this multistate income.  *Container Corp.*, 463 U.S. at 164.  "[W]hen considering the constitutionality of a gross receipts tax, it is the activities that generate those gross receipts that are determinative in an apportionment analysis as it is only the receipts generated from the in-state component of the underlying activity that the Township may properly tax under constitutional apportionment principles." *See Jefferson Lines*, 514 U.S. at 190 (gross receipts tax is "simply a variety of tax on income, which [is] required to be apportioned to reflect the location of the various interstate activities by which it was earned").

While the Supreme Court has characterized the principle of fair apportionment as "the lineal descendent of *Western Live Stock*'s prohibition of multiple taxation," *Jefferson Lines*, 514 U.S. at 184 (referring to *Western Live Stock v. Bureau of Revenue,* 303 U.S. 250 (1938)), the external consistency requirement ultimately mandates that a tax not "reach[ ] beyond that portion of value that is fairly attributable to economic activity within the taxing State," whether there is a genuine risk of multiple taxation or not. *Id.* at 185; *see also Southern Pac. Transp. Co. v. Arizona, Dep't of Revenue*, 44 P.3d 1006, 1012 (Ariz. Ct. App. 2002) (rejecting "proposition that a state's tax on interstate commerce must be deemed externally consistent unless the aggrieved taxpayer establishes that a multiple tax burden actually exists").

The ordinance at issue makes two distinctions.  The first is between "collection" and other activities.  The second is between activities that occur "in Seattle" and those that do not. The City argues that the collection tax can be applied to all the gross income Philip Services receives from its customers in Seattle  for whom Philip Services picks up waste.  The problem with the City's argument is that the only income Philip Services receives is from customers that pay to have their waste picked up, but the services Philip Services provide those customers go far beyond picking up the waste.  The evidence is clear that after Philip Services collects the waste from customers in Seattle, it transfers, treats, and disposes of the waste, documenting these steps to comply with regulatory requirements.  (Docket Entry No. 5-9 at Stipulations 15, 18, 19, 20, 32; Docket Entry No. 5-23 at 59–61).  All of the taxed waste was transported out of Seattle at some stage of treatment and disposal.  (Docket Entry No. 5-9, Stipulation 43, 44).

The plain language of the ordinance distinguishes among stages in the disposal process. Under the statute, "the tax imposed under subsection B [the collection tax] of this section applies only to collecting solid waste in the City." The stages identified include but are not limited to "collection." "Transfer" is a separate activity that is seperately taxed. Philip Services receives gross income not only for its collection of hazardous waste, but also for transferring, treating, and disposing of the waste. (Docket Entry No. 5-9, Stipulations 32–33). The plain language of the ordinance states that the collection tax is limited to gross income "from the collection of solid waste." *See City of Spokane ex rel. Wastewater Management v. Washington State Dept. of Revenue*, 145 Wash.2d 445, 449 (interpreting regulation that distinguished between sewage collection and transfer, treatment, or disposal).

The City cites *In the Matter of CWM Chemical Services, Inc.*, 2003 WL 22989161 (N.Y. Tax App. Trib. Dec. 11, 2003), to support its argument that it is improper to tax "some components" of an "integrated tax service." In that case, the court rejected New York's attempt to impose a sales tax on waste treatment and disposal services provided in New York, by a waste-management company that collected the waste in other states and transported it to New York for treatment and disposal. The issue was whether any sales tax was due on the waste treatment and disposal services provided in the state for waste picked up out of state. The court held that New York did not have a sufficient nexus to the taxable transaction and the taxpayer customer to impose a sales tax on that customer or, as a result, obligate the waste company to collect and remit such a tax. The court analyzed the New York sales tax under the *Complete Auto Trasit v. Brady,* 430 U.S. 274 (1977), test to determine what state could

19

impose a sales tax for a transaction that involved services in more than one state.  In the *CWM* case, the court emphasized that the sale was consumated outside New York, and the place where the performance began—the real property where the waste was picked up—was located outside New York.  As a result, New York lacked the requisite nexus to impose a sales tax.  2003 WL 22989161 at *5–6.

The City emphasizes that in the *CMW* case, the court held that the sales tax was imposed on the taxable receipt for an "integrated trash removal service, which may include pickup began outside by pick-up of the waste product, transportation, processing and disposal of waste."   2003 WL 22989161 at *7.  The "integrated service" was a "real property maintenance service"; the sales tax on the gross receipts for that service could only be imposed where the real property was located, which was where the service was sold and performance begun.  This approach avoided the problem of multiple sales taxation of customers, because only one state would have the predicate nexus with the localized sales transaction.  *Id*.

The nature of the tax in the present case, and the issues that result, are different from the tax and issues in *CMW* in important ways.  The tax here is a tax imposed on gross income from a specified activity—collection of solid waste in the City of Seattle—not a sales tax imposed on a customer.  The United States Supreme Court has made it clear that a sales tax paid in the taxing state on an interstate transaction need not be apportioned, but that an income, gross receipts, or transaction privilege tax on such a transaction will violate the Commerce Clause in the absence of fair apportionment. *Oklahoma Tax Com'n v. Jefferson Lines, Inc.*, 114 U.S. 175, 188–91 (1995).  In *Jefferson Lines*, the Court held that an Oklahoma retail sales tax applied to

the entire proceeds of bus ticket sales for travel from Oklahoma to destinations in other states did not violate the Commerce Clause. *Id.* The *Jefferson Lines* Court observed that, in contrast to the approach it had taken toward the taxation of business income from interstate activities, it had "consistently approved taxation of sales without any division of the tax base among different States, and [has] instead held such taxes properly measurable by the gross charge for the purchase, regardless of any activity outside the taxing jurisdiction that might have preceded the sale or might occur in the future." *Id.* In *Jefferson Lines*, the Court stated that a sales tax imposed on the buyer for purchases of services can ordinarily be treated as a local state event and that such "sales with at least partial performance in the taxing State justify that State's taxation of the transaction's entire gross receipts in the hands of the seller." *Id.* at 189. A gross receipts tax on a business, rather than a sales tax on a purchaser, does raise the apportionment issue. A gross receipts tax is a " variety of tax on income," which must be apportioned to reflect the location of the various interstate activities by which it was earned. *Id.* at 190.[3]

---

[3] As a prominent treatise has stated:

> While *Jefferson Lines* sustained states' power to impose unapportioned retail sales taxes on the sale of services involving interstate activities, it strengthened taxpayers' ability to assert the position that gross receipts taxes imposed on business activity must be fairly apportioned if they are measured by receipts from interstate business activity. By drawing a sharp line between gross receipts taxes and retail sales taxes and characterizing the gross receipts tax in Central Greyhound Lines, Inc. v. Mealey, as akin to an income tax, the Court has called into question some of its earlier decisions that approved, with little analysis, unapportioned gross receipts taxes merely because they were imposed on a "local" subject and could loosely be analogized to retail sales taxes.

2 Jerome R. Hellerstein & Walter Hellerstein, *State Taxation* ¶ 18.08 [5], at 18-65 to -66 (3d ed.1998) (footnote omitted).

Because of the sharp distinction that *Jefferson Lines* has drawn between sales and gross receipts taxes, the City's reliance on *CMW* is misplaced.

The City argues that Philip Services is simply deducting expenses to calculate gross income, which the code forbids. The Seattle Municipal Code defines "gross income" as follows:

> "Gross income" means the value proceeding or accruing from the sale of tangible property or service, and receipts (including all sums earned or charged, whether received or not), by reason of the investment of capital in the business engaged in, including rentals, royalties, fees or other emoluments, however designated (excluding receipts or proceeds from the use or sale of real property or any interest therein, and proceeds from the sale of notes, bonds, mortgages or other evidences of indebtedness, or stocks and the like) and without any deduction on account of the cost of the property sold, the cost of materials used, labor costs, interest or discount paid, or any expense whatsoever, and without any deduction on account of losses, including the amount of credit losses actually sustained by the taxpayer whose regular books or accounts are kept upon an accrual basis.

SMC § 5.48.020(B). The evidence does not support the City's argument. Philip Services is not arguing that it should be able to deduct from the gross income it receives for collecting hazardous waste materials in Seattle expenses such as the cost of operating the collection vehicles or paying its employees. Instead, Philip Services presented evidence showing that the gross income it receives is not generated only from collecting the hazardous wastes in Seattle, but also from transferring, treating, and disposing of that waste, which occurs both in and out of Seattle. (Docket Entry No. 5-23 at 59–65).

The City's ordinance is carefully crafted to comply with the apportionment requirement that applies to a gross receipts tax. The City's ordinance, as noted, is limited to gross income

from the collection of solid waste in the City of Seattle.  The record makes it clear that some of the gross income on which the collection tax was imposed was generated by activities other than collection and that occurred outside the taxing jurisdiction.  The language of the ordinance and the undisputed testimony make it clear that the gross income Philip Services receives may be taxed, but only that portion of the income generated from the collection of solid waste in the City of Seattle.[4]  This court reverses  the Bankruptcy Court's finding that the City of Seattle correctly calculated the collection tax because the City calculated the tax based on all the gross income Philip Services received rather than allocating the income between collection services provided in the City and other services, many of which were provided outside the City.

### F.      Did the Recycling Exceptions to the Transfer Tax and Collection Tax Apply?

The ordinance excepts from the transfer tax amounts of waste that are recycled materials, stating that:  "solid waste transported for recycling or reuse as recovered material (solid waste containing no more than ten (10) percent non-recyclable material, by volume) . . . shall not be included in the tonnage by which the fee or tax is measured."   Seattle Municipal Code § 5.48.055A.  Solid waste transported for "recycling or reuse as recovered material" is not subject to the transfer tax.  The collection tax is measured in part "per ton of solid waste collected in Seattle, excluding the tonnage from recycling."  SMC § 5.48.055B(2).  The gross-receipts measure of the collection tax excludes income from the collection of "recycled materials and or recovered materials."  *Id.*

---

[4]This finding is consistent with, but not dependant on, the unpublished opinion cited by Philip Services in its motion for reconsideration to the Bankruptcy Court. *Burlington Environmental, Inc. v. City of Bremerton*, No. 31923-3-II (Court of Appeals, Washington, Division II, Feb 15, 2006)

The ordinance defines "recycling" in section 5.30.040N:

> "Recycling" or "recycle" means transforming or remanufacturing waste materials into usable or marketable materials for use other than incineration (including incineration for energy recovery) or other methods of disposal.

SMC 5.30.040N (cross-referencing SMC 21.26.016(2)). "'Recyclable' means material: 1. That is collected for recycling or reuse, such as papers, glass, plastics, used wood, sand, building debris, metals, yardwaste, used oil and tires; and 2. That if not collected for recycling would otherwise be destined for disposal at a landfill or incineration." *Id.* at § 5.30.040L. "'Recycled material' means material: 1. That is in fact recycled, re-used, or reprocessed after collection; and 2. If not recycled, re-used or reprocessed, would have been destined for disposal at a landfill or incineration." *Id.* at § 5.30.040M. "'Recovered material' means a usable or marketable product or commodity that results from recycling or material owned or acquired from another, but excludes use for landfill or incineration." *Id.* at § 5.30.040K.

The City reduced the amount of its tax assessment claim to reflect the fact that some of the waste was recycled materials, including some water and alternative fuel. (Docket Entry No. 5, Ex. 8 at Stipulations 34–35). The City based the amount of the reduction on the amounts of treated waste labeled as "recycled" in Philip Services's records. The City refused to reduce the claim to include other treated water. (*Id*. at Stipulation 34). Philip Services argues that all contaminated water that was collected, treated, and discharged into a sanitary sewer and ultimately released into navigable waters, or that was added as an ingredient to alternative fuels are "recovered" and "reused" and excepted from taxation. (Docket Entry No. 3 at 23).

The Bankruptcy Court rejected Philip Services's argument, finding that Philip Services had not met its burden of showing that taking contaminated water and treating it enough for discharge into a municipal sewer system for further treatment and ultimate discharge into Puget Sound was "recycling" or "recovering." The evidence showed that when water was discharged into the City of Kent's municipal sewer, it was not simply released into Puget Sound. Instead, that water had to be treated with other waste in the municipal sewer before it could be discharged into navigable waters. That water was not recycled or recovered by Philip Services but instead discharged into a third-party's treatment system.

The evidence also showed that some of the water Philip Services treated was added to other waste and burned. Such waste is not "recycled" or "reused" because the terms "recycling" and "recovered material" exclude materials that are incinerated. SMC § 5.30.040K, N. Philip Services failed to show that it was entitled to further tax adjustments based on excluding water used make the showing for recycling exemptions from the transfer tax or the collection tax.

## G.    Are the Transfer Tax and Collection Tax Provisions Unconstitutional?

In the Bankruptcy Court, Phillip Services raised a constitutional challenge to the transfer tax provision designed to "prevent pyramiding." The transfer tax is imposed "upon the business of transferring solid waste generated in or outside of Seattle from one (1) mode of transportation to another a fee or tax . . . per ton of the waste handled for transportation or transported for garbage disposal, landfill, or incineration purposes. To prevent pyramiding of the tax under this subsection when two (2) or more transfers occur in Seattle, the fee or tax is imposed only upon the last transferor and shall not apply to earlier transfers." Section 5.480. According to Philip

Services, the result is discrimination prohibited by the Commerce Clause because the transfer tax applies to all waste transfers leaving Seattle and not to waste transfers remaining in Seattle. (Docket Entry No. 3 at 14).  Philip Services points out that it disposes of all the taxed waste outside Seattle and much of it outside the State of Washington.

A state tax on interstate commercial activity violates the Commerce Clause unless it (1) is fairly apportioned, (2) is applied to an activity with a substantial nexus to the taxing state, (3) does not discriminate against interstate commerce, and (4) is fairly related to the services or benefits provided by the state.  *Matter of Eagle Bus Mfg., Inc*., 50 F.3d 317, 317–18 (5th Cir. 1995) (citing *Complete Auto Transit v. Brady*, 430 U.S. at 279)."  The Bankruptcy Court rejected Philip Services's argument, concluding that the purpose of the antipyramiding provision was to tax transfers only once, whether there are single or multiple transfers.  Because the tax applied in the same way whether the transfer was for "disposition in Seattle or out of Seattle," the Bankruptcy Court found no constitutional violation.

This court agrees.  The transfer tax is imposed on the last transfer, whether it is intrastate or interstate.  The City's transfer tax provision does not reach movements in interstate commerce while exempting movements in intrastate commerce, but instead only taxes the last of two or more transfers that occur in the City.  There is no unconstitutional discrimination against interstate commerce.  *Cf. Oregon Waste Sys., Inc. v. Department of Envtl. Quality of Or.*, 511 U.S. 93, 108 (1994) (striking down as discriminatory a $2.25 per ton surcharge on "waste generated in other States," as opposed to $0.85 per ton surcharge on in-state waste); *Chemical Waste Management, Inc. v. Hunt*, 504 U.S. 334, 342 (1992) (discriminatory tax

26

imposed on disposal of out-of-state hazardous waste); *Waste Management, Inc. v. Metropolitan Gov't of Nashville and Davidson County*, 130 F.3d 731 (6th Cir. 1997) (striking disposal fee for disposing waste at unapproved facilities outside Nashville).

Philip Services also argues that the collection tax was unconstitutionally applied because it was based on all the income received from Seattle customers, which includes revenues from activities performed outside Seattle, the taxing jurisdiction.  As a result, it is "discriminatory (because interstate commerce bears a potential burden not borne by local commerce), unfairly apportioned (because the tax measure is of out of [sic] all proportion to the activities engaged in within the City) and not reasonably related (because the activities engaged within the City are not reasonably related to income derived from activities performed outside the City)." (Docket Entry No. 3 at 28).  Philip Services argues that $95,200 of the gross income taxed was improperly included because it is generated by services performed outside Seattle.  (*Id.* at 27). This court's ruling that the collection tax is limited to collection services that are performed in the City of Seattle, reversing this aspect of the Bankruptcy Court's opinion and remanding to permit recalculation of the collection tax, makes it unnecessary to reach the constitutional issue.

## IV.   Conclusion

The Bankruptcy Court's rulings denying Philip Services's objection to the City of Seattle's tax claims are affirmed with the exception of the ruling denying the objection to the calculation of the collection tax.

This case is remanded to the Bankruptcy Court for proceedings consistent with this memorandum and opinion.  This appeal is dismissed.

SIGNED on March 2, 2007, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge